J-S13025-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| TERRELL LAMONT CHILDS | |
| Appellant | No. 928 WDA 2015 |

Appeal from the PCRA Order Entered May 12, 2015
In the Court of Common Pleas of Allegheny County
Criminal Division at No: CP-02-CR-0000620-2008

BEFORE:  LAZARUS, STABILE, and FITZGERALD,[*] JJ.

MEMORANDUM BY STABILE, J.:                    **FILED MAY 13, 2016**

Appellant, Terrell Lamont Childs, appeals from the May 12, 2015 order dismissing his petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46.  We affirm.

In a prior memorandum, this Court summarized the underlying facts and procedural history:

> The facts underlying Appellant's arrest and conviction were aptly summarized by the trial court[:]
>
> > At approximately 8:30 a.m. on April 19, 2007, on a Smithfield Street sidewalk between Fourth Avenue and Forbes Avenue in Downtown Pittsburgh, Appellant shot the victim, Jibreel Scott, five times in his torso.  Jibreel Scott was the brother of Obataiye Scott, an individual who was suspected and

_____

[*] Former Justice specially assigned to the Superior Court.

subsequently pled guilty in 2008 to killing Appellant's brother, Jerome Childs. Jerome Childs had been shot and killed at a bar in the Hill District Section of the City of Pittsburgh on April 11, 2007, one week before the Jibreel Scott shooting.

Shortly before the Jibreel Scott shooting, Appellant, an African-American male, exited a stolen blue Subaru with Pennsylvania registration GMC-0958 that was parked on Fourth Avenue. He was wearing a hoody, a long black trench coat, and black gloves. He disguised his features by wearing a dark dreadlocks wig and a false beard. He walked from Fourth Avenue and turned right onto Smithfield Street where he confronted Kevin Alton, who was making a telephone call from a phone booth on Smithfield Street. Appellant approached the left side of Mr. Alton, seized him by the front of his coat, and pointed a gun in his face. After looking at him for a few seconds, Appellant released Mr. Alton, stating, 'My bad, young'n. This ain't for you.'

Minutes later, and a few feet from his confrontation with Mr. Alton, Appellant encountered Jibreel Scott, who was walking on Smithfield Street. Appellant confronted Scott and shot him once, and Scott fell to the ground. Appellant then grasped Mr. Scott by his collar, bent over him, and fired several additional shots into his torso. Immediately afterwards, with the gun still in his hand, Appellant fled back down Smithfield Street to Fourth Avenue where he had parked the Subaru, entered it, and drove up Fourth Avenue.

[…]

On April 20, 2007, the morning following the shooting, police recovered a fake beard, two dreadlocks wigs, a right-handed, black batting type glove, and a black trench coat, which were scattered near a dumpster in a parking lot at 3443 Ward Street, in the Oakland section of the City of Pittsburgh. DNA samples were taken from the glove, the mouth area and ear straps of the beard, and one of the wigs, and the results were compared to

- 2 -

reference samples from Appellant and Gary Adams. [Gary Adams was initially investigated as a suspect in the murder of Scott, but was later excluded based upon his height, weight, and skin tone, and the fact that none of the DNA samples matched his profile.] The mouth area of the beard provided a single DNA source. Appellant was the person who contributed the DNA that as found on the mouth area of the beard. The ear straps of the beard and the glove both yielded mixed DNA samples of two or more individuals, and the dreadlocks wig was a mixture of three or more individuals. Gunshot residue was found on both sleeves of the coat, as well as on the glove.

In the early evening of April 23, 2007, on Ophelia Street in the South Oakland section of the City of Pittsburgh, police recovered the blue Subaru Sports Edition WRX, with Pennsylvania license plate GMC-0958, which had been reported stolen by its owner. The Subaru was found .6 miles from where the wigs, beard, and other items were found, and 2.9 miles from where the shooting on Smithfield Street took place. A rust brown colored propylene fiber lifted from the driver's seat of the Subaru was consistent with propylene fiber from the beard. A brown colored wool fiber lifted from the front passenger seat of the vehicle was consistent with fibers from one of the dreadlocks wigs.

On April 26, 2007, one week after the shooting, the victim, Jibreel Scott, was pronounced dead at Mercy Hospital. He died as a result of multiple gunshot wounds to the torso, and the manner of death was homicide.

Trial Court Opinion (T.C.O.), 1/27/11, at 4-8 (footnotes and record citations omitted).

Appellant was subsequently arrested and charged with murder in both the first and third degree and carrying a firearm without a license. Before trial, Appellant sought recusal of the trial judge and the suppression of a statement, both of which were denied. Following a five-day jury trial, on April 27, 2009, a jury returned a verdict of guilty on all charges. Appellant was

sentenced on August 6, 2009, to a term of life imprisonment for murder in the first degree, and a consecutive term of imprisonment of from three years to six years for carrying a firearm without a license.

***Commonwealth v. Childs***, 47 A.3d 1239 (Pa. Super. 2012) (table), unpublished memorandum at 1-3, *appeal denied*, 50 A.3d 124 (Pa. 2012).

This Court affirmed Appellant's judgment of sentence, and our Supreme Court denied allowance of appeal on August 21, 2012. Appellant filed this timely first PCRA petition on November 19, 2013.[1] Appointed counsel filed an amended petition on November 19, 2014 and the Commonwealth answered the amended petition on March 17, 2015. On April 13, 2015, the PCRA court filed a Pa.R.Crim.P. 907 notice of intent to dismiss Appellant's petition without a hearing. The PCRA court entered an order dismissing the petition on May 12, 2015, and this timely appeal followed.

Appellant raises five issues for our review:

    I.    Whether [Appellant's] claim for relief properly cognizable [sic] under the [PCRA]?

    II.    Did the lower court abuse its discretion in denying the petition alleging counsel's ineffectiveness without a hearing, where [Appellant] established the merits of the claim that trial counsel was ineffective for failing to object to and request that the jury be instructed to reconsider

_____

[1] Appellant's judgment of sentence became final on November 29, 2012, ninety days after the Pennsylvania Supreme Court denied allowance of appeal. SUP. CT. R. 13. Appellant's petition meets the timeliness requirement of 42 Pa.C.S.A. § 9545(b)(1).

their mutually inconsistent guilty verdicts of first degree murder and third degree murder?

III.   Did the lower court abuse its discretion in denying the petition alleging counsel's ineffectiveness without a hearing, where the [Appellant] established the merits of the claim that trial counsel was ineffective for failing to argue on appeal that the court erred in admitting the gruesome, color, full-body nude autopsy photographs of the victim over trial counsel's objection, since these photographs were highly inflammatory, cumulative of other evidence, and unduly prejudicial?

IV.   Did the lower court abuse its discretion in denying the petition alleging counsel's ineffectiveness without a hearing, where [Appellant] established the merits of the claim that trial counsel and appellate counsel were ineffective for failing to argue that critical exculpatory evidence that someone else admitted to committing the crime was admissible, even though it constituted hearsay, on the grounds that [Appellant] had a right to present a defense under the United States and Pennsylvania Constitutions?

V.   Did the lower court abuse its discretion in denying the petition alleging counsel's ineffectiveness without a hearing, where [Appellant] established the merits of the claim that trial counsel was ineffective for failing to argue that critical exculpatory evidence that the victim's description of the shooter given to a third party did not match [Appellant] was admissible on the grounds that [Appellant] had a right to present a defense under the United States and Pennsylvania Constitutions?

Appellant's Brief at 4-5.

We agree with Appellant's assertion that his claims are cognizable under the PCRA. We have already concluded that Appellant's petition was timely. He is currently serving a life sentence in accord with § 9543(a)(1), and his claims of counsel's ineffective assistance are cognizable under

- 5 -

§ 9543(a)(2)(ii). 42 Pa.C.S.A. § 9543(a)(1), (2)(ii). We therefore proceed to the merits.

"[A]n appellate court reviews the PCRA court's findings of fact to determine whether they are supported by the record, and reviews its conclusions of law to determine whether they are free from legal error." *Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014). "The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level." *Id.* Dismissal without a hearing is appropriate when the PCRA court "is satisfied [. . .] that there are no genuine issues concerning any material fact and that the defendant is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings[.]" Pa. R. Crim. P. 907(1).

To prevail on a claim of counsel's ineffective assistance, a petitioner must plead and prove: (1) the arguable merit of the underlying claim; (2) the absence of any reasonable strategic basis for counsel's action or inaction; and (3) prejudice, *i.e.*, a reasonable probability the outcome would have been different but for counsel's mistake. *Commonwealth v. Henke*, 851 A.2d 185, 187 (Pa. Super. 2004), *appeal denied*, 863 A.2d 1144 (Pa. 2004). The petitioner bears the burden of proving counsel's ineffectiveness. *Commonwealth v. Khalil*, 806 A.2d 415, 421 (Pa. Super. 2002), *appeal denied*, 818 A.2d 503 (Pa. 2003).

Appellant asserts trial counsel was ineffective for failing to object to an inconsistent verdict—guilty of both first- and third-degree murder. Our Supreme Court has addressed this issue and found no inconsistency between convictions for first- and third-degree murder:

> [The appellant] argues that the two verdicts are legally inconsistent, because the conviction for first degree murder requires a finding that [the appellant] had a specific intent to kill, while the conviction for third degree murder requires the opposite finding that [the appellant] did not have a specific intent to kill. This, however, is an incorrect statement of the law.
>
> Contrary to [the appellant's] assertion, third degree murder is not a homicide that the Commonwealth must prove was committed with malice and without a specific intent to kill. Instead, it is a homicide that the Commonwealth must prove was committed with malice, but one with respect to which the Commonwealth need not prove, nor even address, the presence or absence of a specific intent to kill. Indeed, to convict a defendant for third degree murder, the jury need not consider whether the defendant had a specific intent to kill, nor make any finding with respect thereto. Thus, there is no inconsistency in the jury's convicting Appellant of both first and third degree murder.

*Com. v. Young*, 748 A.2d 166, 174-75 (Pa. 1999)), *on reargument in part* (Pa. 2000); *see also Commonwealth v. Meadows*, 787 A.2d 312, 317 (Pa. 2001)(same);[2] *Commonwealth v. Kimbrough*, 872 A.2d 1244, 1256 (Pa. Super. 2005) (*en banc*) (explaining that verdicts were not inconsistent

_____

[2] The Supreme Court issued divided opinions in *Young* and *Meadows*, but the consistency of first and third degree murder convictions was not the divisive issue.

where conviction for voluntary manslaughter required proof of specific intent to and conviction for third degree murder required proof of malice).

Appellant ignores this controlling case law in favor of ***Commonwealth v. Brightwell***, 424 A.2d 1263 (Pa. 1981), wherein the Supreme Court referred to verdicts of guilty on voluntary manslaughter and third degree murder as "obviously inconsistent." ***Id.*** at 425. On collateral review, the Supreme Court held that the issue of counsel's failure to object to these verdicts was of arguable merit. ***Id.*** at 426. The Court also concluded that counsel had a reasonable strategic basis, as the defendant received a not guilty verdict on first-degree murder, and counsel did not want the jury to have an opportunity to revisit an unrecorded verdict. ***Id.*** at 427.

***Brightwell***, therefore, held only that the issue was of arguable merit, and this Court has recognized that the Supreme Court "tempered" ***Brightwell*** in ***Young*** and ***Meadows***. ***Commonwealth v. Kimbrough***, 938 A.2d 447, 449-50 (Pa. Super. 2007) ("***Kimbrough II***"). In summary, ***Young*** and ***Meadows*** are directly on point and controlling, and we discern no arguable merit in Appellant's first assertion of ineffective assistance of counsel.

Next, Appellant claims trial counsel was ineffective for failing to appeal the trial court's decision to admit several autopsy photographs. The admissibility of photographs of a murder victim rests within the sound discretion of the trial court:

- 8 -

Photographs of a murder victim are not *per se* inadmissible.... The admission of such photographs is a matter within the discretion of the trial judge. The test for determining the admissibility of such evidence requires that the court employ a two-step analysis. First[,] a court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

[. . .]

A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

**Commonwealth v. Mollett**, 5 A.3d 291, 301 (Pa. Super. 2010) (quoting

**Commonwealth v. Tharp**, 830 A.2d 519, 531 (Pa. 2003)), *appeal denied*,

14 A.3d 826 (Pa. 2011). We will find an abuse of discretion only when the

essential evidentiary value of the photograph is clearly outweighed by the

inflammatory effect the picture will have upon the minds and passions of the

jurors. **Commonwealth v. LeGares**, 709 A.2d 922, 924 (Pa. Super. 1998),

*appeal denied*, 729 A.2d 1127 (Pa. 1998).

Appellant relies on **LeGares**, in which this Court ordered a new trial

based on the trial court's erroneous admission of a photograph of the victim.

> [T]he color slide is quite gruesome. The grim visage highlights in gory detail the destruction wreaked upon the victim's skull by the 20-gauge shotgun blast. The left side of the victim's head is shown, the flesh flayed from the skull and folded back, the fractured skull wired together to reveal the gaping entry wound, and the victim's brain removed. The slide image was rendered all the more ghastly by the large size of its colored projection.

*Id.* at 924-25. The *LeGares* Court therefore concluded the photograph was inflammatory. *Id.* at 925. Since it was cumulative of other evidence in the record, we concluded the trial court erred in admitting it.

Appellant also relies on *Commonwealth v. Powell*, 241 A.2d 119 (Pa. 1968). There, the forensic pathologist relied on "color-slide films of the deceased in an effort to help the jury understand his medical testimony." *Id.* at 120. Our Supreme Court ordered a new trial because the slides were not "of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Id.* at 121.[3] The Supreme Court described the record as evincing a "clear felony murder case where the force used and the nature and extent of the injuries involved have no bearing on a finding of first degree felony murder." *Id.* The victim died of multiple head injuries sustained during the commission of a robbery. *Id.* at 120.

Finally, Appellant cites *Commonwealth v. Eckhart*, 242 A.2d 271, 274 (Pa. 1968), in which our Supreme Court ordered a new trial where the

---

[3] This standard differs from the one presently in force.

- 10 -

trial court admitted a photograph of the victim's skull with the scalp pulled aside to reveal the damage the defendant inflicted on the victim's skull.

> It is difficult to imagine a photograph more gory, more likely to inflame a jury, than that in the instant case. It was a photograph of decedent's skull with the fissures therein, revealed by pulling the scalp forward. The jury saw a skull and a tangled mass of bloody hair and part of a bloody scalp. Appellee urges that the photograph was necessary to show the force of appellant's blows and that the force came from the front. The Commonwealth's medical witness testified that the jury could get a better understanding of the injuries by viewing the pictures. [. . .] Assuming however that the photograph as a whole was helpful to the doctor's testimony, that is only because of the skull itself. While the skull itself is not particularly pleasant to view, it is a veritable Michelangelo compared to the gruesome scalp and bloody web of tangled hair. The scalp and hair are totally irrelevant, and highly inflammatory. They could easily have been excised from the photograph.

*Id.* at 274.

In summary, Appellant relies on cases in which the Commonwealth introduced photographic evidence of particularly gruesome head wounds. In *LeGares* and *Eckhart*, the victims' scalps were partially removed, revealing damage to the victims' skulls. The instant case is easily distinguishable. The Commonwealth introduced four photographs depicting the multiple gunshot wounds to the victim's torso. Counsel objected to the photographs at trial, arguing that the Commonwealth could use a diagram of a human torso, and that the defense was not contesting any physiological findings. N.T. Trial, 4/21-27/2009, at 256. The trial court admitted them subject to a limiting instruction. Counsel did not challenge the trial court's decision on direct appeal.

The Commonwealth's forensic pathologist testified that the victim sustained five gunshot wounds to the torso. *Id.* During the pathologist's testimony, the Commonwealth introduced four photographs of the victim over defense counsel's objection. *Id.* at 257. The trial court described the photographs: "They are colorful photographs that show the victim in various postures and depicted with gunshot wounds to the victim." *Id.* The trial court also gave the following limiting instruction:

> Ladies and gentlemen of the jury, during the course of the doctor's testimony you will be viewing four separate photographs. Those separate photographs depict the victim in this case at the Allegheny County morgue and they are not pleasant to look at. You should not in this instance allow the nature of these photographs or the depiction of the wounds to inflame you or prejudice your decision to impact the defendant. The photographs are being admitted for one purpose and one purpose alone, that is to allow the doctor to fully explain the testimony and his opinions that he has gleaned by virtue of his examination totally and also of those wounds. Thank you.

*Id.* at 257-58.

According to the pathologist's testimony, one photograph depicted three of the five wounds; one to the "left upper chest," one to the "left shoulder region," and one to the "right upper quadrant of the abdomen." *Id.* at 259. The second photograph depicted an entrance wound in the victim's "upper chest and arm." *Id.* at 261. The pathologist also used the second photograph to indicate that the bullet causing the depicted entrance wound exited through the "left trapezius area." *Id.* Third photograph depicted an exit wound in the victim's right anterior abdomen and an

entrance wound in the victim's "right sixth rib." *Id.* The fourth photograph showed exit wounds corresponding to two of the entrance wounds depicted in the first and second photographs. *Id.* at 262. One exit wound was in the "left trapezius area" and the other was under the victim's armpit. *Id.* The pathologist went on to testify that two of the bullets hit the victim's thoracic spinal column. *Id.* at 263. The pathologist opined that the victim died of multiple gunshot wounds to the torso. *Id.* at 264.

The Commonwealth's photographic evidence in this case is distinguishable from *LeGares*, *Powell*, and *Eckhart* for several reasons. First, the photographs do not depict a head wound. Second, the photographs do not evince any graphic detail beyond what would be expected for a gunshot wound to the torso. The photographs do not depict, for example, skin peeled back to reveal the victim's skeleton. We therefore cannot conclude the photographs are inflammatory. Rather, the photographic evidence is "merely consonant with the brutality of the subject of inquiry." *Mollett*, 5 A.3d at 301 Thus, the photographs are admissible if they are relevant and of aid to the jury. *Id.* Here, the photographs are relevant to Appellant's intent, and they were of assistance to the forensic pathologist in describing the cause of the victim's death. The Commonwealth could have, as Appellant argues, used a diagram of a human torso. The same is true in any case. To accept Appellant's argument would exclude photographic evidence of the victim in most or all cases, a result our

law does not permit.  Counsel was not ineffective for failing to appeal the trial court's admission of autopsy photographs.  The underlying issue lacks arguable merit.

Next, Appellant argues counsel was ineffective for failing to argue that the trial court's exclusion of hearsay evidence violated Appellant's constitutional right to present a defense.  Appellant sought to present Chris Green ("Green"), who would have testified that Gary Adams ("Adams") told Green that Adams shot the victim.  Adams was a suspect in this case, but investigators concluded the eyewitness accounts and DNA evidence implicating Appellant excluded Adams as the culprit.  Appellant sought to introduce Green's account of Adams' statement under Pa.R.E. 804(b)(3) (statement against interest),[4] but the trial court found that Green was not a reliable person of authority and that Green's account of Adam's statement lacked sufficient indicia of reliability.  This Court affirmed the trial court's

_____

[4] (3) *Statement Against Interest.* A statement that:

> (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa.R.E. 804(b)(3).

decision. **Childs**, 47 A.3d 1239, unpublished memorandum at 13. In other words, Appellant fully litigated the hearsay issue, and this Court affirmed the trial court's finding the evidence was not sufficiently reliable to qualify for the 804(b)(3) hearsay exception.

In **Holmes v. South Carolina**, 547 U.S. 319 (2006), the United States Supreme Court considered whether "a criminal defendant's federal constitutional rights are violated by an evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." **Id.** at 321. The defendant was convicted of the rape of an 86-year-old woman. **Id.** at 322. The defendant attempted to prove that another man, Jimmy McCaw White told acquaintances that the defendant was innocent and/or that White committed the crime. **Id.** at 323. The South Carolina Supreme Court held that "where there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence." **Id.** at 324. As such, the evidence of the third party's guilt was inadmissible at trial.

The **Holmes** Court acknowledged that "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." **Id.** Nonetheless, the Sixth and Fourteenth Amendments of the United States Constitution guarantee criminal

defendants "a meaningful opportunity to present a complete defense." *Id.* Thus, "evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve" violate a criminal defendant's constitutional rights. *Id.*

The *Holmes* Court deemed the South Carolina rule arbitrary because it focused on the strength of the prosecution's case with "little, if any, examination of the credibility of the prosecution's witnesses or the reliability of its evidence." *Id.* at 329. "[B]y evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of the contrary evidence offered by the other side to rebut or cast doubt. *Id.* at 331. As such, the South Carolina rule was disproportionate to the purpose it was designed to serve—"*i.e.*, to focus the trial on the central issues by excluding evidence that has only a very weak connection to the central issues." *Id.* at 330.

Appellant also cites *Chambers v. Mississippi*, 410 U.S. 284 (1973). Leon Chambers, convicted of murder, sought to prove that Gable McDonald confessed to three acquaintances that McDonald, not Chambers, committed the murder. *Id.* at 289. McDonald also gave a signed confession to Chambers' attorneys, but later repudiated it. *Id.* at 287-88. Chambers called McDonald as a defense witness. *Id.* at 290. The defense introduced McDonald's confession during counsel's direct examination. *Id.* at 291. On cross examination, the prosecutor elicited the evidence of McDonald's

repudiation of the confession. *Id.* At the close of cross examination, the trial court denied Chambers' motion to examine McDonald as a hostile witness because McDonald did not implicate Chambers. *Id.* at 291-92. Thus, Chambers' counsel could not conduct an examination to challenge McDonald on the circumstances of his repudiation. The trial court based its ruling on Mississippi's "voucher rule," whereby the party who calls a witness is presumed to vouch for his or her credibility. *Id.* at 295-96. The trial court also refused to allow Chambers to introduce the three witnesses to whom McDonald had confessed. The trial court excluded two witnesses because their testimony would have been hearsay. *Id.* at 292-93. The third witness took the stand but was not allowed to testify about McDonald's confession because it was hearsay.[5] *Id.* The Supreme Court wrote as follows:

> In sum, then, this was Chambers' predicament. As a consequence of the combination of Mississippi's 'party witness' or 'voucher' rule and its hearsay rule, he was unable either to cross-examine McDonald or to present witnesses in his own behalf who would have discredited McDonald's repudiation and demonstrated his complicity. Chambers had, however, chipped away at the fringes of McDonald's story by introducing admissible testimony from other sources indicating that he had not been seen in the cafe where he said he was when the shooting started, that he had not been having beer with Turner, and that he possessed a .22 pistol at the time of the crime. But all that remained from McDonald's own testimony was a single written confession countered by an arguably acceptable

_____

[5] Mississippi's statement against interest hearsay exception applied to statements against pecuniary, not penal, interest. *Id.* at 299.

- 17 -

renunciation. Chambers' defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted.

*Id.* at 294. In addition, "[t]he testimony rejected by the trial court here **bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest**." *Id.* at 302 (emphasis added). Thus, Chambers' inability to cross-examine McDonald and introduce evidence of his confessions to other persons denied him a fair trial. *Id.* at 302-03.

Pennsylvania case law also recognizes that evidence rules can be unenforceable where they interfere with a criminal defendant's right to present a complete defense. In ***Commonwealth v. Ward***, 605 A.2d 796 (Pa. 1992), our Supreme Court wrote: An accused has a fundamental right to present evidence so long as the evidence is relevant and not excluded by an established evidentiary rule. *Id.* at 797. The defendant was accused and convicted of burning down his brother's building after an argument between the two. *Id.* The defendant also lived in the building, and thus lost many of his possessions in the fire. *Id.* The defendant sought to introduce the testimony of a Red Cross worker, from whom the defendant requested assistance after the fire. *Id.* Also, the defendant sought to introduce the testimony of a police officer, for whom the defendant had been an informant for eight years, to establish that the defendant's cooperation with law

enforcement gave other people a motive to burn down the building in which the defendant lived. *Id.* at 798.

> Thus, "[i]f the proffered testimony had been admitted, the jury would have been faced with evidence of other parties having a motive to commit the crimes and with evidence negating appellant's motive to destroy his own possessions. Either of these two points might have raised a reasonable doubt as to appellant's guilt.

*Id.* at 797. The trial court erred in excluding these two witnesses, because the defendant's credibility was a central issue and because the witnesses could have bolstered the defendant's credibility. *Id.* at 798. "Hearsay objections to specific questions should have been dealt with as they arose during the examination of the witness, not by excluding the witnesses altogether." *Id.*

Likewise, Appellant relies on *Commonwealth v. Spiewak*, 617 A.2d 696 (Pa. 1992), in which the trial court excluded some of the rape victim's prior statements under the rape shield law.[6] The defendant admitted having sexual intercourse with his stepdaughter, but claimed it occurred only after she reached her sixteenth birthday. *Id.* at 697. In a prior custody hearing, the stepdaughter testified that she had been seduced by a friend of the defendant's prior to her sixteenth birthday. *Id.* The circumstances of the alleged encounter with the defendant's friend was very similar to her accusation against the defendant—an older man induced her to have oral

_____

[6] 18 Pa.C.S.A. § 3104.

sex by offering her cocaine. *Id.* Thus, the defendant sought to introduce that evidence to refute the victim's accusation that defendant had sex with her prior to her sixteenth birthday. *Id.* at 699. He claimed the trial court's application of the rape shield law violated his Sixth Amendment right to confront his accuser.

The *Spiewak* Court noted that the rape shield law does not preclude relevant evidence that may exculpate a criminal defendant. *Id.* at 699 (citing *Commonwealth v. Majorana*, 470 A.2d 80 (Pa. 1983)). The Supreme Court acknowledged that the rape shield law serves valid and important objectives: "abating the victim's ordeal at trial, lessening the possibility of unjust influence by controlling inflammatory evidence tending to cast the victim as somehow being the cause of the assault, and encouraging reports of rape." *Id.* at 701. Nonetheless, the Pennsylvania Supreme Court cautioned against mechanistic application of evidence rules where their application will "abridge a defendant's right of confrontation by denying admission of highly reliable and relevant evidence critical to his defense." *Id.*

The victim's prior testimony that a man other than defendant was involved in the sexual encounter in question would have supported an inference that the defendant did not have sex with the victim prior to her sixteenth birthday. Furthermore, the Supreme Court assessed the victim's testimony as "inconsistent" and "confused." As such, the trial court's

exclusion of evidence of the victim's prior sexual encounter violated the defendant's right to confront his accuser. **_Id._** at 702.

Appellant argues the trial court erred in concluding Green's account of Adams' confession does not meet the hearsay exception of Pa.R.E. 804(b)(3). In essence, he argues that application of the rule against hearsay rendered his trial unfair under the Sixth and Fourteenth Amendments of the United States Constitutions and Article I, § 9 of the Pennsylvania Constitution. Appellant argues that if counsel had relied on **_Holmes_**, **_Chambers_**, **_Ward_**, and **_Spiewak_**, rather than Rule 804(b)(3), Green's testimony would have been admitted and the outcome of the trial probably would have been different. We disagree.

**_Holmes_** is easily distinguishable, as that case concerned a South Carolina rule permitting the trial court to exclude defense evidence implicating another person based on the court's assessment of the strength of the prosecution's case. The United States Supreme Court concluded the rule was arbitrary and not tailored to serve its underlying goals. Appellant offers no such argument about the rule against hearsay and the exception set forth in Rule 804(b)(3).

**_Chambers_** is distinguishable on its facts. There, Mississippi's "voucher" rule precluded defendant Chambers from treating McDonald as a hostile witness even though Chambers had evidence that McDonald committed the murder. Likewise, Mississippi's hearsay exceptions for a

statement against interest did not apply to statements against penal interest. Thus, by a mechanical application of several state evidence rules, the trial court excluded critical exculpatory evidence from multiple sources. The **Chambers** Court took care to cabin the breadth of its holding:

> We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and \*303 procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

**Chambers**, 410 U.S. at 302-03. The Pennsylvania Supreme Court, in **Commonwealth v. Spotz**, 18 A.3d 244 (Pa. 2011), briefly addressed **Chambers**:

> [T]he United States Supreme Court ruling in **Chambers** was highly dependent upon the facts and circumstances of that case, in which an unusual convergence of two state rules of evidence resulted in an injustice of constitutional proportions. **Chambers** cannot generally be relied upon to support common, straightforward challenges to hearsay rulings that have correctly applied state

**Id.** at 275.

Instantly, unlike **Chambers**, the proffered hearsay evidence does not bear the indicia of reliability necessary for admission as a statement against interest under Rule 804(b)(3). As noted above, the trial court found the indicia of reliability lacking, and this Court affirmed the trial court's ruling on

- 22 -

direct appeal. The trial court therefore did not engage in a mechanistic application of an exclusionary rule. Rather, the court analyzed the proffered hearsay and found, under the specific circumstances of this case, that Green's account of Adams' confession was inadmissible. The issue of reliability is not properly before us on collateral review, as it has been previously litigated. 42 Pa.C.S.A. § 9543(a)(3).

The Pennsylvania Supreme Court's analysis in **Ward** and **Spiewak** further reinforces this point. The **Ward** Court did not hold that exclusion of hearsay evidence violated the defendant's Due Process rights. Rather, the Supreme Court held the trial court erred in excluding witnesses, and that trial court could address hearsay objections question-by-question. **Ward** does not support a conclusion that Due Process requires admission of hearsay evidence deemed insufficiently reliable to meet the exception of Rule 804(b)(3). Likewise, in **Spiewak**, the Pennsylvania Supreme Court held that the rape shield law did not preclude admission of "**highly reliable and relevant evidence critical to [the] defense.**" **Spiewak**, 671 A.2d at 701 (emphasis added).

In addition to the lack of reliability of Green's hearsay, the record contains other evidence implicating Appellant and exculpating Adams. As noted above, Adams was dismissed as a suspect because he did not match eyewitness descriptions of the perpetrator, and because DNA evidence retrieved from the perpetrator's disguise matched Appellant and did not

match Adams. Appellant's assertion of ineffective assistance of counsel fails because, in light of all the circumstances of this case, the underlying issue lacks arguable merit.

Appellant's fifth and final argument rests on the same legal principles as his fourth, that is, counsel was ineffective for failing to argue that the trial court's exclusion of evidence violated Due Process. In this case, Appellant sought to present the statement of the victim's brother, Obataiye Scott ("Scott"). According to Appellant, the victim described his assailant to Scott in the hospital before the victim passed away, and Scott located and murdered one person and shot at least one other person Scott believed matched the victim's description. N.T. Trial, 4/21-27/2009, at 81, 110. Appellant sought to introduce this evidence—in the form of a recorded statement Scott gave to police—to establish that he did not meet the victim's description of the assailant. The Commonwealth argued the statement was irrelevant and inadmissible hearsay. *Id.* Defense counsel noted that one of Scott's victims had dreadlocks. *Id.* The trial court excluded the evidence as irrelevant. Appellant argues counsel was ineffective for not arguing for the admissibility Scott's statement on constitutional grounds.

Appellant offers little analysis in support of this argument. We offer several observations. First, that one of Scott's victim's had dreadlocks is inculpatory, not exculpatory. As noted above, eyewitnesses testified that

the assailant wore a dreadlocks wig. Next, nothing in the record indicates that more than one assailant was responsible for or conspired in the victim's death. Thus, the exculpatory value of Scott's retaliation against at least two persons is therefore limited. We therefore conclude counsel was not ineffective for failing to argue the admissibility of Scott's statement on constitutional grounds. Furthermore, since Scott's statement was at least partially inculpatory of Appellant, it is highly unlikely that the admission of the statement would have affected the result of the trial.

In summary, we have concluded that Appellant's substantive arguments lack merit. We therefore affirm the order dismissing his petition.

Order affirmed.

Judge Lazarus joins this memorandum.

Justice Fitzgerald concurs in the result.